# UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF FLORIDA
### PANAMA CITY DIVISION

| | |
|---|---|
| IN THE MATTER OF THE SEARCH OF: THE OFFICE OF ONE PERSON | Case No. 5:23-mj-63-MJF <br><br> UNDER SEAL |

## AFFIDAVIT IN SUPPORT OF AN APPLICATION UNDER RULE 41 FOR A WARRANT TO SEARCH AND SEIZE

I, L. W. Magruder, being first duly sworn, hereby depose and state as follows:

## INTRODUCTION

1.     I make this affidavit in support of an application under Rule 41 of the Federal Rules of Criminal Procedure for a warrant to search the premises known as 314 S. Baylen Street, Pensacola, FL, Unit 110 (the PREMISES), further described in Attachment A, for the things described in Attachment B.[1]

---

[1] Attached as Attachment C is the Filter Protocol for CHRISTOPHER RODRIGUEZ Vehicle, Premises, and Digital Devices. I understand that these procedures will be used in the execution of the requested search warrant.

2.     Unless otherwise stated, the conclusions and beliefs I express in this affidavit are based on my training, experience, and knowledge of the investigation, and reasonable inferences I've drawn from my training, experience, and knowledge of the investigation.

## AFFIANT BACKGROUND

3.     Your affiant is a sworn special agent of the United States Bureau of Alcohol, Tobacco, Firearms, and Explosives ("ATF") assigned to the Tampa Field Division, Panama City Satellite Office, and has been since 2002. Prior to this employment, your affiant was employed as a Georgia State Trooper from 1999 through 2002.Your affiant has participated in numerous drug-related, gang related and firearms trafficking related investigations that have resulted in the arrest, apprehension, and conviction of those involved in armed narcotics trafficking, firearms trafficking and the distribution of controlled substances. Your affiant is also aware of firearms trafficking methods and common practices used to acquire, ship and distribute firearms unlawfully. Your affiant is also knowledgeable regarding the trends used by many criminal organizations, gangs, or violent offenders using

2

firearms in conjunction with their unlawful acts, including intimidation, protection, aggravated assault, aggravated battery, security etc. Your affiant has prepared, participated in, and executed multiple search warrants for recovery of evidence involving the distribution of controlled substances, and firearms related offenses. Your affiant has also conducted numerous investigations for various firearms related offenses, which resulted in the arrest, apprehension, and conviction of those involved. As such, I am an "investigative or law enforcement officer" of the United States within the meaning of Title 18, United States Code, Section 2510(7), that is, an officer of the United States who is empowered by law to conduct investigations of, and to make arrests for, offenses enumerated in Section 2516 of Title 18, United States Code.

4.    The facts in this affidavit come from my personal observations, my training and experience, and information obtained from other agents, witnesses, and agencies. This affidavit is intended to show merely that there is sufficient probable cause for the requested warrant. It does not set forth all my knowledge, or the knowledge of others, about this matter.

5.      Based on my training and experience and the facts as set forth in this affidavit, I respectfully submit that there is probable cause to believe that violations of 18 U.S.C. § 970(a) (Damaging Property Occupied by Foreign Government); 18 U.S.C. § 844(h) (Explosive Materials—Commission of a Federal Felony); 18 U.S.C. § 844(i) (Explosive Materials—Malicious Use); and 26 U.S.C. §§ 5841, 5861(d), and 5871 (Receipt or Possession of Unregistered Firearm) (the TARGET OFFENSES) have been committed by CHRISTOPHER RODRIGUEZ (the Subject) and other identified and unidentified persons, including others who may have been aided and abetted by, or conspiring with, the Subject, as well as others observed by the Subject. There is also probable cause to search the PREMISES, further described in Attachment A, for the things described in Attachment B.

4

## PROBABLE CAUSE

6.     On November 4, 2023, RODRIGUEZ (Defendant) was charged in a criminal complaint filed in the District Court for the District of Columbia with violations of 18 U.S.C. § 970(a) (Damaging Property Occupied by Foreign Government); 18 U.S.C. § 844(h) (Explosive Materials—Commission of a Federal Felony); 18 U.S.C. § 844(i) (Explosive Materials—Malicious Use); and 26 U.S.C. §§ 5841, 5861(d), and 5871 (Receipt or Possession of Unregistered Firearm). On November 9, 2023, Defendant was indicted on those same charges.

7.     The ATF Washington Field Division's Arson and Explosives group (ATF-WASHINGTON) is investigating an attempted explosives attack that occurred on or about September 25, 2023, sometime between midnight and 3:00 a.m., at approximately 3300 Van Ness Street NW, Washington, D.C., 20008 (TARGET LOCATION 1), about 12 feet from the back wall and fence of the Embassy of the People's Republic of China (Chinese Embassy), located at 3505 International Place, NW, Washington, D.C. TARGET LOCATION 1 is shown in Exhibit A below.

## Exhibit A



8.     On Monday, September 25, 2023, at approximately 2:45 a.m.,

U.S. Secret Service (USSS) officers discovered an unattended bag at

TARGET LOCATION 1, next to a streetlight. The bag, an Ozark brand

black backpack, had a strip of reflective tape that had been placed down

the front center of the bag. Inside of the backpack was a bag of Expert

Grill brand charcoal briquets. Inside the bag of charcoal briquets was

approximately fourteen pounds of a grey granular material and two clear

6

plastic containers containing approximately a half-pound each of a similar grey granular substance. One of the containers had a partial bright orange label on it stating, "Rifle Targets." The remainder of the labels had been removed. This packaging (the clear plastic containers with the "Rifle Targets" label) was determined to be consistent with exploding targets.

9.    Based on ATF-WASHINGTON's review of the material, the grey granular material found concealed in the backpack was consistent with ammonium nitrate and aluminum powder. Based on my training and experience, I know that exploding targets consist of a binary explosive mixture and that this binary mixture typically consists of ammonium nitrate and aluminum powder. Based on my training and experience, I also know that exploding targets are designed to initiate when shot with ammunition traveling approximately 2,000 feet per second or faster.

10.    Law enforcement officers have obtained surveillance footage from University of the District of Columbia (UDC), as well as from three businesses and a residence located in the 4400 and 4500 blocks of

Connecticut Avenue, NW. The footage captured an unknown individual—

since identified as Defendant, as explained below —travelling on foot and

in a vehicle (driven by Subject-2) in and around the TARGET LOCATION

1 before and after the backpack containing explosives was discovered, as

described in paragraph 8. Defendant was wearing blue jeans, a long

sleeve black top, tan boots, light-colored baseball cap, a black mask, and

gloves. As detailed below, in some of the surveillance footage, Defendant

can be seen carrying a backpack consistent with the one found containing

the explosives. When leaving the area, Defendant can be seen carrying a

long soft case or bag consistent in shape with a rifle bag, as well as a

light-colored messenger bag. The locations described below are shown in

Exhibit B, a map of the area. Defendant's approximate movements

heading toward TARGET LOCATION 1 are shown by red arrows. The

vehicle's approximate movements are shown by blue stars. A yellow star

marks TARGET LOCATION 1.

*Exhibit B*



11.    At approximately 1:55 a.m., before the discovery of the backpack and explosives by USSS officers described above, Defendant

walked southeast on a walking path on the campus of the UDC, located at 4200 Connecticut Ave., NW, Washington, D.C. Defendant walked near the UDC Amphitheater, through the woods in between Building 46 West and the Sports Complex, and headed south towards the former UDC athletic fields.

12.    At approximately 2:03 a.m., Defendant approached portable toilets located in the construction area of the UDC athletic field. Defendant can be seen manipulating an unidentified object(s) and opening the portable toilet door. Defendant appeared to store an unidentified object(s) in the portable toilet.

13.    At approximately 2:17 a.m., Defendant walked south towards Van Ness Street, NW, carrying a single backpack over his or her shoulder. Defendant can be seen carrying the backpack in Exhibit C. Defendant then crossed Van Ness Street and walked west along Van Ness Street, NW on the same side of the street as TARGET LOCATION 1, carrying what appears to be a backpack. Defendant appeared to set the backpack down at TARGET LOCATION 1, next to a streetlamp, and then crossed the street northbound without it.

*Exhibit C*



14.     At approximately 2:19 a.m., Defendant walked north toward what is believed to be the gravel pile shown on Exhibit B. Defendant returned to the area of the portable toilets but did not open the portable toilets, at approximately 2:21 a.m. At approximately 2:22 a.m., Defendant returned to the area believed to be the gravel pile. At approximately 2:25 a.m., Defendant left the gravel pile and returned to the area of the portable toilets again. At approximately 2:26 a.m., Defendant walked south toward the gravel pile.

15.     At approximately 2:31 a.m., Defendant moved quickly north, away from what is believed to be the gravel pile and back towards the

11

portable toilets. At approximately 2:32 a.m., Defendant placed what appears to be a bag (different from the backpack containing suspected explosives) in front of the portable toilets and placed an unknown item into the bag.

16.    At approximately 2:35 a.m., Defendant walked north away from TARGET LOCATION 1, carrying a bag. Defendant can be seen leaving the area carrying a bag consistent in shape with a rifle bag and a messenger bag in Exhibit D (at approximately 2:38 a.m.).

*Exhibit D*



17.    Surveillance footage also shows a vehicle in the area near TARGET LOCATION 1 in or around the same time as the activity described above. Given that the area is typically has light traffic during timeframe discussed above, it is possible that this activity may be related to that of Defendant.

18.    At approximately 2:04 a.m., a vehicle that had been driving southbound on International Court (just west of the construction area)

13

turned east onto Van Ness Street, NW, and stopped at a streetlamp directly east of the intersection. At approximately 2:05 a.m. the vehicle drove forward and stopped again at a second streetlamp in front of TARGET LOCATION 1 where the suspected destructive device was later placed by Defendant. The driver of the vehicle (Subject-2) momentarily got out of the vehicle and walked toward the rear of the vehicle before returning to the driver's seat.

19.    At approximately 2:07 a.m., the vehicle drove away, continuing eastbound on Van Ness Street, NW. The vehicle stopped along Connecticut Avenue, NW, just north of the Van Ness/UDC Metro stop, located at 3300 Van Ness Street, NW, before continuing northbound on Connecticut Avenue, NW.

20.    On September 26, 2023, law enforcement officers returned to TARGET LOCATION 1, where the suspected destructive device was located and canvassed the area. Law enforcement officers recovered three shell casings near the gravel pile described above and recovered bullet fragmentations from the ground along the outer perimeter wall of the Chinese Embassy. Impact marks located on the wall near the bullet

14

fragments were found behind where the backpack had been located. Based on ATF-WASHINGTON's consultation with ATF Destructive Device Determiners, the concealment of suspected explosives within the backpack, along with the reflective tape and shell casings, were consistent with the tape being used as an aiming point and an attempt to detonate the explosives concealed within the bag. It is further believed that the presence of shell casings near the gravel pile and bullet fragmentations near the wall indicates that one or more subjects attempted to detonate the explosives by shooting at the backpack from in or around that location. The backpack containing the suspected explosives, as well as its contents, are shown in Exhibit E.

*Exhibit E*






## Identification of Defendant Christopher Rodriguez

21.   On or about October 6, 2023, law enforcement officers learned that a search of the National DNA Index Systems (NDIS) had resulted in a "moderate stringency match" between DNA recovered from swabs of the left shoulder strap of the Ozark Trail brand backpack found at TARGET LOCATION 1 on September 25, 2023, and a California Department of Justice Arrestee specimen obtained from Christopher Rodriguez, FBI Number 84558MF8. Law enforcement personnel were able to identify this individual as Defendant, a licensed Florida attorney believed to reside in Panama City, Florida. Law enforcement personnel were also able to identify a 2016 Jeep Patriot, VIN 1C4NJPBB0GD576216, Florida license plate 35AFPD registered to Defendant at 315 E 4th Street, Panama City, Florida. Defendant's Florida Bar profile lists his cell phone number as (850) 791-9526. Google subscriber information for email address chrisrodriguezjustice@gmail.com, with a listed subscriber of Christopher Rodriguez, includes a recovery phone number of (850) 791-9526 associated with the account.

17

22.    Defendant has a current driver's license issued by the State of Florida identifying him as a 5'11" Hispanic male. Based on the State of Florida Department of Highway Safety and Motor Vehicles, a 2016 Jeep Patriot, gray in color with Florida license plate 35AFPD, is registered to Christopher Rodriguez (plate issued 6/18/2021, renewed 12/10/2022, expires 11/2/2024).

23.    On June 27, 2021, Defendant was arrested in Los Angeles County, California, by California Highway Patrol. Defendant was in a 2016 Jeep Patriot, with Texas license plate BC53303, at the time of his arrest. California Highway Patrol queried the Texas license plate and determined it did not match the vehicle. Law enforcement queried the vehicle's VIN and determined Florida license plate 35AFPD was the license plate assigned to the vehicle, and that the vehicle was registered to Defendant. Law enforcement officers approached the vehicle and observed a firearm on the center console. Law enforcement recovered two additional firearms and charged Defendant with possession of loaded/concealed firearm in a vehicle, possession of an unregistered firearm, and possession of a switchblade knife.

18

24.    California Highway Patrol subsequently obtained a search warrant for the vehicle. During the search of the vehicle law enforcement located several bags and jars labeled Tannerite. Tannerite is a brand of exploding targets, which is consistent with the substance recovered from the backpack found outside the Chinese Embassy, as discussed above at paragraphs 8-9.

25.    On or about October 10, 2023, law enforcement officers received License Plate Detection records from the Gwinnett County, Georgia Police Department. These records captured a Jeep bearing Florida license plate 35AFPD in the area of Buford Drive in Gwinnett County Georgia, on September 23, 2023, at approximately 7:02 p.m.

26.    On or about October 10, 2023, law enforcement officers received License Plate Detection records from the Statesville North Carolina Police Department. These records captured a Jeep bearing Florida license plate 35AFPD in the area of 103 C Street, Statesville, North Carolina, on September 24, 2023, at approximately 5:01 a.m.

## Purchases of Components Used in Attempted Attack on the Chinese Embassy

27.    On or about October 6, 2023, law enforcement officers received sales records from U.S. Company A for sales of Ozark Trail brand (a U.S. Company A product) hiker backpacks and Expert Grill brand charcoal briquets by U.S. Company A for the last six months ending with the date of September 25, 2023. These two items (Ozark Trail brand hiker backpack and Expert Grill brand charcoal briquets) are consistent with components recovered from TARGET LOCATION 1 on September 25, 2023 (described above).

28.    On or about October 10, 2023, law enforcement officers received License Plate Detection records from the Harrisonburg Virginia Police Department in Harrisonburg, Virginia. These records captured a Jeep bearing Florida license plate 35AFPD in the area of 35 Burgess Road, Harrisonburg, VA, on September 24, 2023, at approximately 10:19 a.m., 12:05 p.m., and 12:38 p.m. A photo of this Jeep is shown in Exhibit F.

*Exhibit F*



29.    On or about October 10, 2023, law enforcement officers identified a U.S. Company A transaction of interest at U.S. Company A Store 1726, located at 171 Burgess Road, Harrisonburg, VA 22801 (TARGET LOCATION 2), This is approximately 0.5 mile from where the License Plate Detection device captured the aforementioned vehicle. This

transaction occurred on September 24, 2023, at approximately 11:21 a.m., around the same time Defendant's car was seen in the area. On October 11, 2023, law enforcement personnel received the sales receipt from U.S. Company A for this transaction. The receipt included the purchase at TARGET LOCATION 2 of nitrile gloves, an Ozark Trail brand black backpack, and automotive reflective tape. These items are consistent with components recovered from the device at TARGET LOCATION 1 and described above.

30.    On October 11, 2023, law enforcement reviewed U.S. Company A surveillance camera photos of the individual conducting the purchase described above (believed to be RODRIGUEZ). In Exhibit G, the individual can be seen opening the box of nitrile gloves during the purchase, with the Ozark brand black backpack still in the shopping cart. In Exhibit H, the individual can be seen wearing nitrile gloves and placing the backpack into a grocery bag. The individual is wearing blue jeans, tan boots, and a light-colored baseball cap, which are consistent with the clothes worn by Defendant, as seen in the surveillance video described above. The individual is wearing a neon yellow long-sleeved

shirt and appears to be wearing a black shirt underneath. A comparison of the items purchased to the items recovered from the crime scene, and of the clothing worn by the purchaser to the surveillance footage of Defendant, as well as the License Plate Detection records, the timing advance data for (850) 791-9526, associated with Defendant, and the DNA evidence, though inconclusive, support the inference that Defendant is the individual who purchased the backpack and other items and that those items were used in the attack against the Chinese Embassy on September 25, 2023.

*Exhibit G (subject opening gloves)*



*Exhibit H (subject purchasing backpack)*



31.    On   October   13,   2023,   law   enforcement   reviewed   U.S.
Company A surveillance camera footage of the individual conducting the
purchase   described   above.   During   the   review   of   the   footage,   a   bag
containing a yellow box can be seen in the shopping cart. U.S. Company
A surveillance camera footage also shows the individual shopping prior
to checkout, and the yellow box can be seen in the shopping cart. On or
about October 17, 2023, U.S. Company A provided law enforcement with

25

the purchase receipt for the yellow box. The individual purchased a Straight Talk Moto G device.

32.  On October 13, 2023, a U.S. Magistrate Judge issued search and seizure warrants (ECF No. 23-sc-2214) for information held by AT&T, Verizon Wireless, and T-Mobile regarding TARGET LOCATION 2. ATF law enforcement officers executed these search warrants the same day. Law enforcement personnel are continuing to analyze the returns from the warrants issued in 23-sc-2214.

33.  On October 13, 2023, law enforcement received call detail records from T-Mobile associated with (850) 791-9526 (the phone number listed in Defendant's Florida bar profile) that provided an associated International Mobile Subscriber Identity (IMSI) of 310240191570535. Timing advance data for IMSI 310240191570535 (received in response to the search warrants issued in 23-sc-2214) places (850) 791-9526 in the vicinity of TARGET LOCATION 2 between the hours of 10:17 a.m. and 11:56 a.m. on September 24, 2023, around the time of the U.S. Company A transaction described above.

## Purchase of "Burner" Phone to Use in the Attack on the Chinese Embassy

34. On or about October 24, 2023, ATF agents received a copy of surveillance camera footage from U.S. Company A Store 1726 located at 171 Burgess Road, Harrisonburg, VA. The footage captures the purchase of a Straight Talk Moto G phone by an individual (believed to be Defendant) wearing blue jeans, tan boots, florescent yellow long sleeve top, light-colored baseball cap, and face mask on September 24, 2023, at approximately 11:10 a.m.

35. On October 25, 2023, law enforcement officers received transaction records from TracFone regarding the purchase of the Moto G phone described above. The Account ID associated with the purchase was ThomasJeffersonFree@gmail.com. Law enforcement officers also determined that the device was returned on September 24, 2023, to U.S. Company A Store 1780, located at 975 Hilton Heights Rd, Charlottesville, VA, at approximately 6:22 p.m.

36. Law enforcement officers reexamined the previously received sales records from U.S. Company A for Ozark Trail brand backpacks and

27

Expert Grill brand charcoal briquets and identified a transaction of interest at U.S. Company A Store 1780 in Charlottesville, VA, that occurred on September 24, 2023, at approximately 4:02 p.m.

37. On or about October 27, 2023, law enforcement officers obtained surveillance camera footage and transaction receipts from U.S. Company A Store 1780 in Charlottesville, VA. In the footage from September 24, 2023, at approximately 4:02 p.m., an individual wearing blue jeans, tan boots, a black short-sleeved shirt, a light-colored baseball cap, a dark face mask, and nitrile gloves can be seen purchasing a bag of Expert Grill brand charcoal briquets. The individual—believed to be Defendant—then can be seen exiting the store.

38. On September 24, 2023, at approximately 6:22 p.m., surveillance camera footage shows an individual, believed to be Defendant, wearing blue jeans, tan boots, a black short-sleeved shirt, a light-colored baseball cap, and a dark face mask returning an item at the electronics section of U.S. Company A Store 1780. At approximately 6:25 p.m., the individual purchased a different Straight Talk device and subsequently returned it at approximately 6:37 p.m. At approximately

6:39 p.m., the individual purchased a U.S. Company A Family Mobile device. Exhibit I shows this individual exiting U.S. Company A Store 1780.

*Exhibit I*



39.    On October 5, 2023, a U.S. Magistrate Judge issued search and seizure warrants (ECF No. 23-sc-2161) for information held by AT&T Corporation, Verizon Wireless, and T-Mobile US, Inc., regarding TARGET LOCATION 1. ATF law enforcement officers executed these

search warrants the same day. Defendant's phone number (850) 791-9526 does not appear in these results.

40.    On October 20, 2023, a U.S. Magistrate issued search and seizure warrants (ECF No. 23-sc-2266) for information held by T-Mobile regarding Defendant's phone number (850) 791-9526. ATF law enforcement officers executed these search warrants the same day. Law enforcement personnel are continuing to analyze the returns from the warrants issued in 23-sc-2266. Analysis to date indicates that Defendant's phone number (850) 791-9526 was in the Charlottesville, VA area on September 24, 2023, from approximately 3:00 p.m. to 9:00 p.m.

41.    Based on search warrant results for Defendant's phone number (850) 791-9526 first used a cell site in the Charlottesville area at 3:03 p.m. on September 24, 2023. The device appears to consistently use cell sites in the Charlottesville area until approximately 9:02 p.m. There is no cell site location data recorded on this device from approximately 9:02 p.m. on September 24, 2023, to 10:52 a.m. on September 25, 2023, when the device is again using a cell site in the Charlottesville area. The

device then appears to leave the Charlottesville area at approximately 1:12 p.m. on September 25, 2023.

42.   On November 3, 2023, law enforcement received call detail records from TracFone associated with (434) 872-1785 that provided an associated Electronic Serial Number (ESN) of 016439000109944. These records also include call detail records showing use of the phone from approximately September 24, 2023, to October 25, 2023. Based on the facts described above and below, it is reasonable to believe that Defendant purchased the Moto G phone assigned (434) 872-1785 and used it in connection with the TARGET OFFENSES.

43.   The TracFone records show an outgoing call from the Moto G phone assigned (434) 872-1785 to a phone number used by a taxicab company servicing Northern Virginia and Washington, D.C., at 1:14 a.m. on September 25, 2023. Records obtained from the taxicab company show that the passenger using (434) 872-1785 was picked up at 542 23rd Street South, Arlington, VA, 22202, at approximately 1:28 a.m. on September 25, 2023, and dropped off at 4500 Connecticut Avenue N.W., Washington, 20008, a few blocks from the Chinese Embassy.

44.    The TracFone records show an outgoing call from the Moto G phone assigned (434) 872-1785 to a phone number used by a taxicab company servicing Washington, D.C., and Northern Virginia at 3:09 a.m. on September 25, 2023. Records obtained from the taxicab company show that the passenger using (434) 872-1785 was picked up at 4500 Connecticut Avenue N.W., Washington, 20008, between approximately 3:11 a.m. and 3:32 a.m. on September 25, 2023, and dropped off at 542 23rd Street South, Arlington, VA, 22202.

## Rodriguez's Recent Activity and Arrest

45.    Defendant is believed to reside in Panama City, Florida. On October 12, 2023, law enforcement observed Defendant arrive in the area of 315 E. 4th Street, Panama City, Florida, in a gray 2016 Jeep Patriot bearing Florida license plate 35AFPD. Defendant was observed in this vehicle in Panama City, FL, as recently as November 3, 2023.

46.    On or about November 3, 2023, GPS tracker data (obtained pursuant to search warrant 523-mj-54 issued out of the Northern District of Florida) from the Defendant's Jeep Patriot bearing Florida license plate 35AFPD showed Defendant's Jeep Patriot traveling west from

Panama City, Florida, to a residence in Pensacola, Florida, located at 500 Block of Meadson Place, Pensacola, Florida 32506. GPS tracker data from Defendant's Jeep Patriot license plate 35AFPD further indicates that the Defendant's vehicle remained at this location overnight from November 3, 2023, to November 4, 2023.

47.   On or about November 4, 2023, GPS tracking data from the Defendant's Jeep Patriot bearing Florida license plate 35AFPD revealed that the vehicle had continued traveling west to Louisiana, with an unknown destination. At the same time, cell site location information for Defendant's phone number (850) 791-9526 (obtained through ECF No. 23-sc-2266) showed the phone to be in or near Pensacola, Florida, several hours away. Location information for the phone shows that it remained in the Pensacola, Florida area from November 4, 2023, until November 14, 2023, when it was seized by law enforcement.

48.   On or about November 15, 2023, an ATF Special Agent spoke with Person B, who identified himself as the manager of Law Firm B. According to Person B, RODRIGUEZ was an employee of Law Firm B and RODRIGUEZ worked at both the firm's Panama City and its

33

Pensacola law offices. Person B further stated that RODRIGUEZ was the only attorney representing the firm in Pensacola and that the office is located at 314 S. Baylen Street, Pensacola, FL, Unit #110 (the PREMISES). Person B said that RODRIGUEZ is the only employee from Law Firm B with a key to the PREMISES.

49.   GPS tracking data from RODRIGUEZ's Jeep Patriot (described above) places the vehicle near 314 S Baylen Street, Pensacola, on October 27, November 2, and November 3, 2023.

50.   On November 14, 2023, ATF Special Agent (SA) Allen Davis made consensual contact with Person A at the PREMISES. SA Davis knocked on the door of Suite 110, and Person A invited him to enter the back office of the space. Person A was sitting behind the desk watching the detention hearing for RODRIGUEZ in Louisiana in real time via Zoom. Person A stated that he was "not authorized" to be in Suite 110 (the PREMISES) by Law Firm B. Person A stated that Suite 110 was RODRIGUEZ's office, employed by Law Firm B. Person A said that RODRIGUEZ allows Person A to be in that office space temporarily between various court appearances (the state courthouse is nearby,

34

across Baylen Street). Person A had a briefcase including various items and a laptop. At the conclusion of the hearing, Person A agreed to relinquish his key to the office to SA Davis. Person A further agreed to leave the laptop and briefcase that he purportedly had brought to RODRIGUEZ's office before SA Davis's arrival. SA Davis locked the door to the PREMISES, in the presence of Person A, and later secured the key at the ATF Pensacola Field Office.

51.    On November 17, 2023, an ATF Special Agent assigned to the filter team met with Person A. Person A proved to the ATF Special Agent's satisfaction that the laptop and briefcase belonged to Person A. Person A also confirmed that nothing in the PREMISES belongs to Person A.

52.    As noted above, Defendant has been charged in a criminal complaint filed in the District Court for the District of Columbia with violations of 18 U.S.C. § 970(a) (Damaging Property Occupied by Foreign Government); 18 U.S.C. § 844(h) (Explosive Materials—Commission of a Federal Felony); 18 U.S.C. § 844(i) (Explosive Materials—Malicious Use); and 26 U.S.C. §§ 5841, 5861(d), and 5871 (Receipt or Possession of

Unregistered Firearm), and on November 9, 2023, Defendant was indicted on those same charges. Probable cause therefore exists to believe that RODRIGUEZ has committed crimes for which he has been charged. As set forth below, there is probable cause to believe that the PREMISES described in Attachment A, as well as any Device(s) located in the PREMISES, contains evidence of these crimes. The requested warrant will allow for the search of the PREMISES and the seizure of any Device(s) located in the PREMISES (as well as any other evidence described in Attachment B).

53.    Moreover, it is well-known that virtually all adults in the United States use mobile digital devices. In a fact sheet from June 12, 2019, The Pew Research Center for Internet & Technology estimated that 96% of Americans owned at least one cellular phone, and that that same 2019 report estimated that 81% of Americans use at least one smartphone.    *See*    Mobile    Fact    Sheet, https://www.pewresearch.org/internet/fact-sheet/mobile/    (last    visited Jan. 9, 2021).

54.    In addition, in my training and experience, it is common for individuals to back up or preserve copies of digital media (such as photos and videos) across multiple devices to prevent loss. Indeed, some companies provide services that seamlessly sync data across devices, such as Apple devices and the Apple iCloud service. Thus, there is reason to believe that evidence of the offense that originally resided on the Subject's cell phone may also be saved to other digital devices within the PREMISES.

55.    Based on my training and experience, I also know that some individuals who participate in TARGET OFFENSES have been known to use anonymizing services and/or applications capable of encrypting communications to protect their identity and communications. By using such tools, in some cases, the only way to see the content of these conversations is on the electronic device that had been used to send or receive the communications.

## TECHNICAL TERMS

56.    Based on my training and experience, and information acquired from other law enforcement officials with technical expertise, I

37

know the terms described below have the following meanings or characteristics:

a.    "Digital device," as used herein, includes the following three terms and their respective definitions:

1)    A "computer" means an electronic, magnetic, optical, or other high speed data processing device performing logical or storage functions and includes any data storage facility or communications facility directly related to or operating in conjunction with such device. *See* 18 U.S.C. § 1030(e)(1). Computers are physical units of equipment that perform information processing using a binary system to represent information. Computers include, but are not limited to, desktop and laptop computers, smartphones, tablets, smartwatches, and binary data processing units used in the operation of other products like automobiles.

2)    "Digital storage media," as used herein, means any information storage device in which information is preserved in binary form and includes electrical, optical, and magnetic digital storage devices. Examples of digital storage media include, but are not limited

38

to, compact disks, digital versatile disks ("DVDs"), USB flash drives, flash memory cards, and internal and external hard drives.

3) "Computer hardware" means all equipment that can receive, capture, collect, analyze, create, display, convert, store, conceal, or transmit electronic, magnetic, or similar computer impulses or data. Computer hardware includes any data-processing devices (including, but not limited to, central processing units, internal and peripheral storage devices such as fixed disks, external hard drives, floppy disk drives and diskettes, and other memory storage devices); peripheral input/output devices (including, but not limited to, keyboards, printers, video display monitors, modems, routers, scanners, and related communications devices such as cables and connections), as well as any devices, mechanisms, or parts that can be used to restrict access to computer hardware (including, but not limited to, physical keys and locks).

b. "Wireless telephone" (or mobile telephone, or cellular telephone), a type of digital device, is a handheld wireless device used for voice and data communication at least in part through radio signals and

39

also often through "wi-fi" networks. When communicating via radio signals, these telephones send signals through networks of transmitters/receivers, enabling communication with other wireless telephones, traditional "land line" telephones, computers, and other digital devices. A wireless telephone usually contains a "call log," which records the telephone number, date, and time of calls made to and from the phone. In addition to enabling voice communications, wireless telephones offer a broad range of applications and capabilities. These include, variously: storing names and phone numbers in electronic "address books"; sending, receiving, and storing text messages, e-mail, and other forms of messaging; taking, sending, receiving, and storing still photographs and video; storing and playing back audio files; storing dates, appointments, and other information on personal calendars; utilizing global positioning system ("GPS") locating and tracking technology, and accessing and downloading information from the Internet.

      c.    A "tablet" is a mobile computer, typically larger than a wireless phone yet smaller than a notebook, that is primarily operated

by touchscreen. Like wireless phones, tablets function as wireless communication devices and can be used to access the Internet or other wired or wireless devices through cellular networks, "wi-fi" networks, or otherwise. Tablets typically contain programs called applications ("apps"), which, like programs on both wireless phones, as described above, and personal computers, perform many different functions and save data associated with those functions.

        d.   A "GPS" navigation device, including certain wireless phones and tablets, uses the Global Positioning System (generally abbreviated "GPS") to display its current location, and often retains records of its historical locations. Some GPS navigation devices can give a user driving or walking directions to another location, and may contain records of the addresses or locations involved in such historical navigation. The GPS consists of 24 NAVSTAR satellites orbiting the Earth. Each satellite contains an extremely accurate clock. Each satellite repeatedly transmits by radio a mathematical representation of the current time, combined with a special sequence of numbers. These signals are sent by radio, using specifications that are publicly available.

A GPS antenna on Earth can receive those signals. When a GPS antenna receives signals from at least four satellites, a computer connected to that antenna can mathematically calculate the antenna's latitude, longitude, and sometimes altitude with a high level of precision.

  e. "Computer passwords and data security devices" means information or items designed to restrict access to or hide computer software, documentation, or data. Data security devices may consist of hardware, software, or other programming code. A password (a string of alpha-numeric characters) usually operates as a digital key to "unlock" particular data security devices. Data security hardware may include encryption devices, chips, and circuit boards. Data security software of digital code may include programming code that creates "test" keys or "hot" keys, which perform certain pre-set security functions when touched. Data security software or code may also encrypt, compress, hide, or "booby-trap" protected data to make it inaccessible or unusable, as well as reverse the progress to restore it.

  f. "Computer software" means digital information which can be interpreted by a computer and any of its related components to

direct the way they work. Computer software is stored in electronic, magnetic, or other digital form. It commonly includes programs to run operating systems, applications, and utilities.

g.    Internet Protocol ("IP") Address is a unique numeric address used by digital devices on the Internet. An IP address, for present purposes, looks like a series of four numbers, each in the range 0-255, separated by periods (*e.g.*, 149.101.1.32). Every computer attached to the Internet must be assigned an IP address so that Internet traffic sent from and directed to that computer may be directed properly from its source to its destination. Most Internet service providers control a range of IP addresses. Some computers have static—that is, long-term—IP addresses, while other computers have dynamic—that is, frequently changed—IP addresses.

h.    The "Internet" is a global network of computers and other electronic devices that communicate with each other using numerous specified protocols. Due to the structure of the Internet, connections between devices on the Internet often cross state and

international borders, even when the devices communicating with each other are in the same state.

        i.     "Internet Service Providers," or "ISPs," are entities that provide individuals and businesses access to the Internet. ISPs provide a range of functions for their customers, including access to the Internet, web hosting, e-mail, remote storage, and co-location of computers and other communications equipment. ISPs can offer a range of options in providing access to the Internet, including via telephone-based dial-up and broadband access via digital subscriber line ("DSL"), cable, dedicated circuits, fiber-optic, or satellite. ISPs typically charge a fee based upon the type of connection and volume of data, called bandwidth, which the connection supports. Many ISPs assign each subscriber an account name, a username or screen name, an e-mail address, an e-mail mailbox, and a personal password selected by the subscriber. By using a modem, the subscriber can establish communication with an ISP and access the Internet by using his or her account name and password.

44

j. A "modem" translates signals for physical transmission to and from the ISP, which then sends and receives the information to and from other computers connected to the Internet.

k. A "router" often serves as a wireless Internet access point for a single or multiple devices and directs traffic between computers connected to a network (whether by wire or wirelessly). A router connected to the Internet collects traffic bound for the Internet from its client machines and sends out requests on their behalf. The router also distributes to the relevant client inbound traffic arriving from the Internet. A router usually retains logs for any devices using that router for Internet connectivity. Routers, in turn, are typically connected to a modem.

l. "Domain Name" means the common, easy-to-remember names associated with an IP address. For example, a domain name of "www.usdoj.gov" refers to the IP address of 149.101.1.32. Domain names are typically strings of alphanumeric characters, with each level delimited by a period. Each level, read backwards – from right to left – further identifies parts of an organization. Examples of first-level, or top-

45

level domains are typically .com for commercial organizations, .gov for the governmental organizations, .org for organizations, and .edu for educational organizations. Second-level names will further identify the organization, for example usdoj.gov further identifies the United States governmental agency to be the Department of Justice. Additional levels may exist as needed until each machine is uniquely identifiable. For example, www.usdoj.gov identifies the World Wide Web server located at the United States Department of Justice, which is part of the United States government.

m.    "Cache" means the text, image, and graphic files sent to and temporarily stored by a user's computer from a website accessed by the user in order to allow the user speedier access to and interaction with that website in the future.

n.    "Peer to Peer file sharing" (P2P) is a method of communication available to Internet users through the use of special software, which may be downloaded from the Internet. In general, P2P software allows a user to share files on a computer with other computer users running compatible P2P software. A user may obtain files by

opening the P2P software on the user's computer and searching for files that are currently being shared on the network. A P2P file transfer is assisted by reference to the IP addresses of computers on the network: an IP address identifies the location of each P2P computer and makes it possible for data to be transferred between computers. One aspect of P2P file sharing is that multiple files may be downloaded at the same time. Another aspect of P2P file sharing is that, when downloading a file, portions of that file may come from multiple other users on the network to facilitate faster downloading.

        i.    When a user wishes to share a file, the user adds the file to shared library files (either by downloading a file from another user or by copying any file into the shared directory), and the file's hash value is recorded by the P2P software. The hash value is independent of the file name; that is, any change in the name of the file will not change the hash value.

47

    ii.  Third party software is available to identify the IP address of a P2P computer that is sending a file. Such software monitors and logs Internet and local network traffic.

  o.  "VPN" means a virtual private network. A VPN extends a private network across public networks like the Internet. It enables a host computer to send and receive data across shared or public networks as if they were an integral part of a private network with all the functionality, security, and management policies of the private network. This is done by establishing a virtual point-to-point connection through the use of dedicated connections, encryption, or a combination of the two. The VPN connection across the Internet is technically a wide area network (WAN) link between the sites. From a user perspective, the extended network resources are accessed in the same way as resources available from a private network-hence the name "virtual private network." The communication between two VPN endpoints is encrypted and usually cannot be intercepted by law enforcement.

  p.  "Encryption" is the process of encoding messages or information in such a way that eavesdroppers or hackers cannot read it

but authorized parties can. In an encryption scheme, the message or information, referred to as plaintext, is encrypted using an encryption algorithm, turning it into an unreadable ciphertext. This is usually done with the use of an encryption key, which specifies how the message is to be encoded. Any unintended party that can see the ciphertext should not be able to determine anything about the original message. An authorized party, however, is able to decode the ciphertext using a decryption algorithm that usually requires a secret decryption key, to which adversaries do not have access.

q.     "Malware," short for malicious (or malevolent) software, is software used or programmed by attackers to disrupt computer operations, gather sensitive information, or gain access to private computer systems. It can appear in the form of code, scripts, active content, and other software. Malware is a general term used to refer to a variety of forms of hostile or intrusive software.

## COMPUTERS, ELECTRONIC/MAGNETIC STORAGE, AND FORENSIC ANALYSIS

57.   As described above and in Attachment B, this application seeks permission to seize any digital devices that may be found within the PREMISES. Such devices are defined above and include any electronic system or device capable of storing or processing data in digital form, including central processing units; desktop computers, laptop computers, notebooks, and tablet computers; personal digital assistants; wireless communication devices, such as telephone paging devices, beepers, mobile telephones, and smart phones; digital cameras; peripheral input/output devices, such as keyboards, printers, scanners, plotters, monitors, and drives intended for removable media; related communications devices, such as modems, routers, cables, and connections; storage media, such as hard disk drives, floppy disks, USB flash drives, memory cards, optical disks, and magnetic tapes used to store digital data (excluding analog tapes such as VHS); and security devices. Thus, the warrant applied for would authorize the seizure of digital devices under Rule 41(e)(2)(B). An individually particularized

warrant will be sought for any device seized prior to its being copied or searched. Based on my knowledge, training, and experience, as well as information related to me by agents and others involved in this investigation and in the forensic examination of digital devices, I respectfully submit that, if digital devices are found on the PREMISES, there is probable cause to believe that the items described in Attachment B will be stored in the Device(s) for at least the following reasons:

a. Individuals who engage in criminal activity, including the TARGET OFFENSES use digital devices to access websites to facilitate illegal activity and to communicate with co-conspirators online; to store on digital devices documents and records relating to their illegal activity, which can include logs of online chats with co-conspirators; email correspondence; text or other "Short Message Service" ("SMS") messages; contact information of co-conspirators, including telephone numbers, email addresses, identifiers for instant messaging and social medial accounts; stolen financial and personal identification data, including bank account numbers, credit card numbers, and names, addresses, telephone numbers, and social security numbers of other

individuals; and records of illegal transactions using stolen financial and personal identification data, to, among other things, (1) keep track of co-conspirator's contact information; (2) keep a record of illegal transactions for future reference; (3) keep an accounting of illegal proceeds for purposes of, among other things, splitting those proceeds with co-conspirators; and (4) store stolen data for future exploitation.

b.     Individuals who engage in the foregoing criminal activity, in the event that they change digital devices, will often "back up" or transfer files from their old digital devices to that of their new digital devices, so as not to lose data, including that described in the foregoing paragraph, which would be valuable in facilitating their criminal activity.

c.     Digital device files, or remnants of such files, can be recovered months or even many years after they have been downloaded onto the medium or device, deleted, or viewed via the Internet. Electronic files downloaded to a digital device can be stored for years at little or no cost. Even when such files have been deleted, they can be recovered months or years later using readily-available forensics tools. When a

person "deletes" a file on a digital device such as a home computer, a smart phone, or a memory card, the data contained in the file does not actually disappear; rather, that data remains on the storage medium and within the device unless and until it is overwritten by new data. Therefore, deleted files, or remnants of deleted files, may reside in free space or slack space – that is, in space on the digital device that is not allocated to an active file or that is unused after a file has been allocated to a set block of storage space – for long periods of time before they are overwritten. In addition, a digital device's operating system may also keep a record of deleted data in a "swap" or "recovery" file. Similarly, files that have been viewed via the Internet are automatically downloaded into a temporary Internet directory or "cache." The browser typically maintains a fixed amount of electronic storage medium space devoted to these files, and the files are only overwritten as they are replaced with more recently viewed Internet pages. Thus, the ability to retrieve "residue" of an electronic file from a digital device depends less on when the file was downloaded or viewed than on a particular user's operating

system, storage capacity, and computer, smart phone, or other digital device habits.

58.    As further described in Attachment B, this application seeks permission to seize not only electronic evidence or information that might serve as direct evidence of the crimes described in this affidavit, but also for forensic electronic evidence or information that establishes how the digital device(s) were used, the purpose of their use, who used them (or did not), and when. Based on my knowledge, training, and experience, as well as information related to me by agents and others involved in this investigation and in the forensic examination of digital devices, I respectfully submit there is probable cause to believe that this forensic electronic evidence and information will be in any of the Device(s) at issue here because:

a.    Although some of the records called for by this warrant might be found in the form of user-generated documents or records (such as word processing, picture, movie, or texting files), digital devices can contain other forms of electronic evidence as well. In particular, records of how a digital device has been used, what it has been used for, who has

used it, and who has been responsible for creating or maintaining records, documents, programs, applications, and materials contained on the digital device(s) are, as described further in the attachments, called for by this warrant. Those records will not always be found in digital data that is neatly segregable from the hard drive, flash drive, memory card, or other electronic storage media image as a whole. Digital data stored in the Device(s), not currently associated with any file, can provide evidence of a file that was once on the storage medium but has since been deleted or edited, or of a deleted portion of a file (such as a paragraph that has been deleted from a word processing file). Virtual memory paging systems can leave digital data on a hard drive that show what tasks and processes on a digital device were recently used. Web browsers, e-mail programs, and chat programs often store configuration data on a hard drive, flash drive, memory card, or memory chip that can reveal information such as online nicknames and passwords. Operating systems can record additional data, such as the attachment of peripherals, the attachment of USB flash storage devices, and the times a computer, smart phone, or other digital device was in use. Computer, smart phone,

55

and other digital device file systems can record data about the dates files were created and the sequence in which they were created. This data can be evidence of a crime, indicate the identity of the user of the digital device, or point toward the existence of evidence in other locations. Recovery of this data requires specialized tools and a controlled laboratory environment, and also can require substantial time.

b.      Forensic evidence on a digital device can also indicate who has used or controlled the device. This "user attribution" evidence is analogous to the search for "indicia of occupancy" while executing a search warrant at a residence. For example, registry information, configuration files, user profiles, e-mail, e-mail address books, chats, instant messaging logs, photographs, the presence or absence of malware, and correspondence (and the data associated with the foregoing, such as file creation and last-accessed dates) may be evidence of who used or controlled the digital device at a relevant time, and potentially who did not.

c.      A person with appropriate familiarity with how a digital device works can, after examining this forensic evidence in its proper

context, draw conclusions about how such digital devices were used, the purpose of their use, who used them, and when.

d.    The process of identifying the exact files, blocks, registry entries, logs, or other forms of forensic evidence on a digital device that are necessary to draw an accurate conclusion is a dynamic process. While it is possible to specify in advance the records to be sought, digital device evidence is not always data that can be merely reviewed by a review team and passed along to investigators. Whether data stored on digital devices is evidence may depend on other information stored on the devices and the application of knowledge about how the devices behave. Therefore, contextual information necessary to understand other evidence also falls within the scope of the warrant.

e.    Further, in finding evidence of how a digital device was used, the purpose of its use, who used it, and when, sometimes it is necessary to establish that a particular thing is not present on the device. For example, the presence or absence of counter-forensic programs, anti-virus programs (and associated data), and malware may be relevant to establishing the user's intent and the identity of the user.

## CONCLUSION

59.   I submit that this affidavit supports probable cause for a warrant to search the PREMISES described in Attachment A and to seize the items described in Attachment B.

Respectfully submitted,

*L W MAG*

Special Agent L.W. Magruder
Bureau of Alcohol, Tobacco, Firearms, and Explosives

Affidavit submitted by email and attested to me as true and accurate by telephone, consistent with Fed. R. Crim. P. 4.1 and 41(d)(3) this  28th  day of November, 2023.

/s/ *Michael J. Frank*
_____

MICHAEL J. FRANK
Chief United States Magistrate Judge

## ATTACHMENT A

### *Location to be searched*

The location to be searched is the premises located at **314 S. Baylen Street, Pensacola, FL, Unit 110**. The premises is described as a two-story cream brick building with a black iron balcony that has a dark brown door with a glass insert and two black exterior lights on each side of the door. When traveling north on S. Baylen Street, 314 S. Baylen Street will be on the right side (east side) of the road approximately one block north from W. Main Street. Upon entering No. 314 (the main building), you walk down the main hall to the rear of the building and **Unit 110** is the fourth door on the left. Unit **110** has a light brown stained, multi-pane glass door with the number **110** etched on the glass. The photos below show: (1) the building located at 314 S. Baylen Street; (2) the front door of No. 314; and (3) the door to Unit 110.







## ATTACHMENT B

*Property to be seized*

1.    The items to be seized are fruits, evidence, information, contraband, or instrumentalities, in whatever form and however stored, relating to violations of 18 U.S.C. § 970(a) (Damaging Property Occupied by Foreign Government); 18 U.S.C. § 844(h) (Explosive Materials—Commission of a Federal Felony); 18 U.S.C. § 844(i) (Explosive Materials—Malicious Use); and 26 U.S.C. §§ 5841, 5861(d), and 5871 (Receipt or Possession of Unregistered Firearm) (the "TARGET OFFENSES") that have been committed by Defendant Christopher Rodriguez ("the Subject") and other identified and unidentified persons, as described in the search warrant affidavit; including, but not limited to:

a. Evidence of the TARGET OFFENSES, including but not limited to:

    i. Electronic devices;

    ii. Travel records;

    iii. Receipts;

    iv. Firearms and ammunition;

63

     v. Clothing and footwear similar to that worn by the subjects shown in the video surveillance discussed in the affidavit;

     vi. Binary explosives and any related items;

     vii. Backpacks;

     viii. Charcoal briquets;

     ix. Gloves;

     x. Explosive materials and components; and

     xi. Maps;

b. Evidence of any conspiracy, planning, or preparation to commit the TARGET OFFENSES;

c. Evidence concerning efforts after the fact to conceal evidence of the TARGET OFFENSES, or to flee prosecution for the same;

d. Evidence concerning materials, devices, or tools that were used to unlawfully commit the TARGET OFFENSES;

e. Evidence of communication devices;

f. Evidence of the state of mind of the subject and/or other co-conspirators, *e.g.*, intent, absence of mistake, or evidence indicating preparation or planning, or knowledge and experience, related to the criminal activity under investigation; and

g. Evidence concerning the identity of persons who either (i) collaborated, conspired, or assisted (knowingly or unknowingly) the commission of the criminal activity under investigation; or (ii) communicated with the unlawful actors

about matters relating to the criminal activity under investigation, including records that help reveal their whereabouts.

2.    Records and information that constitute evidence of identity, including but not limited to driver's licenses, identity documents, insurance information, passports, credit cards, gym memberships, leases, property records, and mail.

3.    Address and/or telephone books and papers reflecting names, addresses and/or telephone numbers, which constitute evidence of customers, distributors, conspirators, and potential witnesses of violations of the TARGET OFFENSES.

4.    Records and information—including but not limited to documents, communications, emails, online postings, photographs, videos, calendars, itineraries, receipts, and financial statements—relating to Any records and information relating to:

> a. The attempt to detonate an explosive device in Northwest Washington, D.C., on or about September 25, 2023;
>
> b. The People's Republic of China, including the Embassy of the People's Republic of China located in Washington, D.C.;

c. Travel to, from, and within Washington, D.C., in 2023;

d. Firearms and ammunition;

e. Binary explosives and any related items;

f. Purchases of any cell phones, backpacks, charcoal briquets, gloves, explosive materials and components, firearms, and ammunition; and

g. Maps.

5. Photographs, in particular photographs of co-conspirators, assets, and contraband, which constitute evidence of the TARGET OFFENSES.

6. Evidence of relationships between members of a conspiracy, including evidence of identification and evidence of motivation to engage in TARGET OFFENSES.

7. Cellular telephones, SIM cards, computers, laptops, I-Pads, DVDs, hard drives, and electronic store devices, and receipts reflecting their ownership and use, which contain records of the commission of the TARGET OFFENSES.

8.   Safes, both combination and key type, and their contents, which can contain evidence of the commission of the TARGET OFFENSES or proceeds from the commission of the TARGET OFFENSES.

9.   Indicia of ownership, including, receipts, invoices, bills, canceled envelopes, and keys, which provides evidence of identity as to individuals committing the TARGET OFFENSES; and

10.   Digital devices used in the commission of, or to facilitate, the TARGET OFFENSES.

11.   Routers, modems, and network equipment used to connect computers to the Internet.

As used above, the terms "records" and "information" includes all forms of creation or storage, including any form of computer or electronic storage (such as hard disks or other media that can store data); any handmade form (such as writing); any mechanical form (such as printing or typing); and any photographic form (such as microfilm, microfiche, prints, slides, negatives, videotapes, motion pictures, or photocopies).

The term "digital devices" includes any electronic system or device capable of storing or processing data in digital form, including central processing units; desktop computers, laptop computers, notebooks, and tablet computers; personal digital assistants; wireless communication devices, such as telephone paging devices, beepers, mobile telephones, and smart phones; digital cameras; peripheral input/output devices, such as keyboards, printers, scanners, plotters, monitors, and drives intended for removable media; related communications devices, such as modems, routers, cables, and connections; storage media, such as hard disk drives, floppy disks, USB flash drives, memory cards, optical disks, and magnetic tapes used to store digital data (excluding analog tapes such as VHS); security devices; and any other type of electronic, magnetic, optical, electrochemical, or other high speed data processing devices performing logical, arithmetic, or storage functions.

68

## ATTACHMENT C

## FILTER PROTOCOL FOR CHRISTOPHER RODRIGUEZ, VEHICLE, PREMISES, AND DIGITAL   DEVICES

## I.    **Filter team membership:**

The filter team consists of:

- AUSA Tom Gillice (Supervisor)
- AUSA Maeghan Mikorski
- Special Agent Brian Vaughn (ATF) (electronics)
- Special Agent Shannyn Gardner (ATF) (electronics)
- Special Agent Matthew Hopkins (ATF) (electronics)
- Task Force Officer Charles Shorter (ATF) (vehicle search)
- Special Agent Mary K. Evans (ATF) (premises searches—Panama City, FL, and Pensacola, FL)

## II.    **Basic procedures for the search of any physical location:[2]**

A. Only members of the filter team will conduct the search of any

physical location.  Members of the investigation/prosecution

team may be present at the search location but only for such

purposes as providing descriptions of the facts of the

investigation to the filter team to assist the filter team's

_____

[2] These procedures are subject to change if the circumstances of the execution of the warrant so demands.

69

determination of what to seize, or for the purpose of
interviewing a target or other person.

B. If the search warrant permits the seizure of electronic storage
devices or hard copies (papers), the filter team will locate and
seize any such devices or papers encountered at the search
location.  After that is completed, the original electronic storage
devices and/or papers will be placed in secure containers, stored
in a secure evidence location, and clearly labeled as containing
potentially protected material.  These secure containers must
not be opened absent approval from the filter team attorney.

C. For purposes of obtaining a statement from the **RODRIGUEZ**,
or other similar urgent reason presented at the time of the
search, the filter team may immediately share with members of
the investigation/prosecution team any evidence within the
scope of the warrant that *unambiguously* does not contain
potentially protected material (e.g., images of child
pornography, a weapon).  "**Protected" material includes**

**attorney-client privileged communications and attorney work product information.**

III.    **Basic procedures related to the filter team review of seized material:**

A. AUSA Mikorski, as the filter team attorney, shall be responsible for ensuring documentation of actions and decisions of the filter team (*e.g.*, in a log), including but not limited to: a chain of custody for items being searched; a chain of custody for relevant material reviewed pursuant to the procedures set forth below; categorization of relevant material as described below; determinations by the court, if any; and chain of custody of material and items returned to defense counsel, if any.  Said documentation may be prepared by filter team agents. Members of the prosecution/investigative team may be on the chain of custody for collected materials, but the log should specify that each member only handled those materials as permitted in this protocol (*i.e.*, a member of the filter team, who should be named in the log, placed the seized item in a secure

71

container affixed with a "potentially protected material" label, which the case team did not open, for purposes of the case team transporting any evidence to Washington, D.C.).

B. The filter team shall not disclose the contents of any potentially protected material to any member of the investigation/prosecution team except as provided below.

C. If a client expressly waives the attorney-client privilege as to his or her files, no further filter review of his or her files (electronic or physical records) for attorney-client privileged material is required. However, the filter team will review such files for attorney work product material. Given the nature of this investigation, the filter team does not expect to approach any of **RODRIGUEZ's** clients to request a privilege waiver. The filter team will contact PSEU if that assessment changes.

D. The filter team may ask **RODRIGUEZ** or counsel for **RODRIGUEZ** whether a seized electronic storage device, file, or email account may contain attorney-client privileged or attorney work product material ("protected material"). If

72

**RODRIGUEZ** or counsel for **RODRIGUEZ** states in writing that an electronic storage device, email account, or file does not contain either attorney-client privileged or attorney work product material, then no further filter review is required.

E. The filter team shall err on the side of caution and treat any questionable items as potentially protected materials. In addition:

1. The filter team shall treat as potentially protected any letter, e-mail, memorandum, or other document containing a communication between **RODRIGUEZ** (or his agents) and one of his/her attorneys.

2. The filter team shall treat as potentially protected any letter, e-mail, memorandum, or other document containing a communication between **RODRIGUEZ** (or his agents) and one of his/her clients.

F. Filter team members also should be familiar with the legal elements of the attorney-client privilege and the attorney work product doctrine.

73

G. Consultation with investigative agents and/or prosecutors: During the review process, the filter team may rely on descriptions from the investigative agents and/or prosecutors concerning the facts of the investigation, and the scope of the warrants, to assist in its determinations as to the seizure of any document, file, or item, or any other legal question. However, members of the filter team shall not disclose the substance of any Privilege Review Material (as defined below) to any member of the investigation/prosecution team except in accordance with (IV)(C)(4) or (IV)(H) or (IV)(L)(5) below.

H. Except as provided below for redacted material, the filter team attorney shall place all material determined to be privileged or work product protected (protected material) into a secure container or secure electronic file folder marked "privileged information," and return it to counsel for the defendant/target or segregate it, as appropriate. The filter team attorney shall maintain an electronic or manual log detailing the nature of the

74

documents returned or segregated, and the process by which protected materials were stored, protected, and/or returned to defense counsel.

I. Any determinations made about what may or may not be provided to the investigation/prosecution team must be made by the filter team members. Materials that the filter team determines are unambiguously not privileged (*e.g.*, documents that do not relate to the law such as maps, receipts, or directions on how to build explosives) may be handed over to the investigative team with the filter attorney's explicit written approval.

J. Items to be reviewed: The filter team will review responsive seized material except that which could not contain protected material (e.g., firearms, ammunition, explosive materials or components, narcotics, folders or files containing only child pornography). As discussed above, the filter review may be limited or not necessary if **RODRIGUEZ** or counsel for

**RODRIGUEZ** indicates in writing that certain physical records or electronic storage devices do not contain protected materials.

K. Depending on the volume of seized electronic, searchable evidence, search terms designed to identify potentially protected materials may be used. The decision to use search terms will be made by the prosecution team in consultation with the filter team. The specific search terms to be used will be determined by the filter team in consultation with the prosecution team. Documents identified through the use of such search terms will be treated as potentially protected materials for purposes of further review.

IV.   **Filter team review procedures:**

**Electronic Storage Devices**

A. After collecting any electronic storage devices, the filter team will begin the extraction process for each device. The filter team will document in writing each member of the team who is

76

involved in extracting materials from any devices.  No member of the investigative/prosecution team will be permitted to review any materials extracted from any electronic storage device, except as permitted in the sections below.

B. The filter team attorney will identify, as to material responsive to the search warrant, all protected and potentially protected materials on the electronic storage devices.

C. After the filter team has located all protected and potentially protected materials on the electronic storage devices, the filter team then will either (1) create new images of the electronic storage devices that do not contain any protected or potentially protected materials, or (2) place the files that do not contain any protected or potentially protected materials on a new digital media (*e.g.*, a DVD) (collectively "New Media").  This process can be done on a rolling basis.  The filter team then will provide the New Media to the investigation/prosecution team

and work with them to locate material on the New Media that
is responsive to the search warrant.

D. The filter agents will continue to work with the filter team
   attorney in the review of the protected and potentially
   protected materials.

   1. For that protected and potentially protected material that is
      not responsive to the search warrant, the filter team will
      segregate and not disclose that material to the
      investigation/prosecution team.

   2. For that protected and potentially protected material that is
      responsive to the search warrant, the filter team attorney
      will segregate it into four categories: (1) not protected; (2)
      protected and cannot be redacted; (3) protected but can be
      redacted; and (4) potentially protected (e.g., the government
      does not have sufficient information to make that
      determination, or an exception to the applicable protection,
      such as crime-fraud or waiver by disclosure to a third party,

78

may apply).  The filter team attorney will send a copy of the

material in categories 3 (with proposed redactions) and 4

(collectively "Privilege Review Material"), along with the

bases for determinations that any potentially protected

materials are subject to an exception, to counsel for

**RODRIGUEZ**, along with a log.[3]

3. The filter team attorney will work with counsel for

**RODRIGUEZ** to try to reach an agreement as to whether

the Privilege Review Material:  (1) falls within an exception

to the applicable protection, or (2) can be redacted to

eliminate the protected information.  If the filter team

attorney and counsel for **RODRIGUEZ** cannot agree on

these determinations, the filter team attorney will submit

those items to the court for determinations regarding

protection and/or proposed redactions of the material.

---

[3] The log shall include the file name, the type of file, the file date, the creation date, the medium on which the file is located, the sender and recipient (if applicable), and the subject matter.

4. The filter team attorney only will provide Privilege Review Material to the investigation/prosecution team if: (i) the filter team and counsel for **RODRIGUEZ** reach an agreement as to the item; or (ii) the court has ruled that the filter team attorney may provide the item to the investigation/prosecution team.

E. No member of the filter team shall disclose the contents of any Privilege Review Material retrieved from the electronic storage devices other than any materials that are unambiguously not privileged to members of the investigation/prosecution team except in accordance with (IV)(C)(4) directly above.

### Physical Records and/or Items

F. The filter team attorney and agents will review the material to identify protected and potentially protected materials.

G. For that protected and potentially protected material that is responsive to the search warrant, the filter team attorney will

segregate it into four categories:  (1) not protected; (2) protected
and cannot be redacted; (3) protected but can be redacted; and
(4) potentially protected (e.g., government does not have
sufficient information to make that determination, or an
exception to the applicable protection, such as crime-fraud or
waiver by disclosure to a third party, may apply).  The filter
team attorney will send a copy of the material in categories 3
(with proposed redactions) and 4 (collectively "Privilege Review
Material"), along with the bases for determinations that any
potentially protected materials are subject to an exception, to
counsel for **RODRIGUEZ**, along with a log.

H. The filter team attorney will work with counsel for

**RODRIGUEZ** to try to reach an agreement as to whether the
Privilege Review Material:  (1) falls within an exception to the
applicable protection, or (2) can be redacted to eliminate the
protected information.  If the filter team attorney and counsel
for RODRIGUEZ cannot agree on these determinations, the
filter team attorney will submit those items to the court for

determinations regarding protection and/or proposed redactions of the material.

I. The filter team attorney only will provide Privilege Review Material other than any materials that are unambiguously not privileged to the investigation/prosecution team if:  (i) the filter team and counsel for **RODRIGUEZ** reach an agreement as to the item; or (ii) the court has ruled that the filter team attorney may provide the item to the investigation/prosecution team.

J. No member of the filter team shall disclose the contents of any Privilege Review Material to members of the investigation/prosecution team except in accordance with (IV)(H) directly above.